IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARY W.,**

      **Plaintiff,**

  v.

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

Civil Action 2:20-cv-5523
**Chief Judge Algenon L. Marbley
Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff, Mary W., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Memorandum in Opposition (ECF No. 22), and the administrative record (ECF No. 16). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

      **I.    BACKGROUND**

Plaintiff protectively filed her applications for disability insurance benefits and supplemental security income in June 2017, alleging that she has been disabled since March 31, 2017, due to severe depression, PTSD, bipolar disorder, and personality disorder. (R. at 192-201, 225.) Plaintiff's applications were denied initially in September 2017 and upon reconsideration

in January 2018. (R. at 51-124.) Plaintiff sought a *de novo* hearing before an administrative law judge (the "ALJ"). (R. at 126-27.) Plaintiff, who was represented by counsel, appeared and testified at a hearing held on September 17, 2019. (R. at 31-50.) A Vocational Expert ("VE") also appeared and testified. (*Id.*) On October 15, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 9-30.) On August 18, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) This matter is properly before this Court for review.

## II. HEARING TESTIMONY

The ALJ summarized Plaintiff's statements to the agency and her relevant hearing testimony as follows:

> [Plaintiff] alleges disability stemming from mental disorders, described as severe depression, PTSD, bipolar disorder, and personality disorder. She alleged hallucinatory activity. She appeared somewhat distracted during the claims process as well as emotional when discussing symptoms. She spoke in a low tone during the teleclaim. At the hearing, [Plaintiff] testified that she was disabled due to panic attacks. She could not manage the stress of a regular and continuing job (eight hours per day, five days per week). She could not be around strangers due to anxiety and panic attacks. She testified she experienced panic attacks two to three times per week. She testified that she experienced some hallucinations, such as knocking on the windows, doorknobs rattling, a dog in the basement barking, children running, laughing, and playing. She testified that she stayed in bed at least once per week. She testified that she had sleep disruption. She felt agitated, nervous, and scared at the hearing. She reported mood lability. She endorsed trauma-related symptoms. She testified that she could not be around a crowd. She felt this was overwhelming. Her husband reportedly did the grocery shopping, which [Plaintiff] could not do due to crowds and strangers. She testified that she babysat for children weekly. She described the incident with hearing a baby crying in the basement and trying to find and console the baby, which was not real. She testified that she could not make it through a regular workweek due to these symptoms.

(R. at 17-18 (internal citations omitted).)

### III. MEDICAL RECORDS

The ALJ summarized the relevant medical records concerning Plaintiff's mental health impairments:

> [Plaintiff] was evaluated for increased depression in March 2016; however, she did not allege delusions, ideas of reference, or psychosis. She further had never been psychiatrically hospitalized or evaluated by a psychiatrist. She was treated primarily through primary care providers. [Plaintiff] also told the source that stressors at the time exacerbated symptoms, including "caretaking [three] adult men who live in her home" including her husband who was recovering from surgery, her "dad" who had a heart attack, and an "uncle" who required hospitalization for seizure. [Plaintiff] indicated that she also had an adult stepson in the home. She was responsible for cleaning and meals. This was overwhelming to her; however, despite the increase in symptoms, her mental status exam was fairly benign. She appeared mildly dysthymic but overall normal speech, good eye contact, and normal thoughts. The source assigned [Plaintiff] a GAF of 55, indicative of only moderate symptoms or limitations. The source recommended medications to address mood lability and anxiety with insomnia. Subsequent notes document some improvement with an increase in medications to address breakthrough symptoms. She resumed working at Sears, which she found to be stressful, but otherwise no significant issues were noted. Follow-up notes document stress related to her living and familial situation in addition to working six to seven days per week. The source recommended medication changes to address symptoms. However, while [Plaintiff] appeared tearful and described being overwhelmed, she did not show significant deterioration in mental functioning. She further reported significant improvement with life changes related to psychosocial stressors as well as medication and treatment, generally. She showed improvement on objective mental status exam as well. Her mood and function remained stable through August 2016. She later stated that work was a stressor with increased anxiety; however, she was accused of harassment, which is a stressful incident. Further, she told sources that she "gets along well with her immediate coworkers" and felt that the company was targeting her to eliminate the position. This tends to show that [Plaintiff] was mentally capable of performing work despite stressors and further any impairment at work does not appear to be related to [Plaintiff]'s mental impairments. She continued to do well through November, including at work.
>
> In January 2017, just prior to [Plaintiff]'s alleged onset date, she reported an increase in irritability while at work and anxiety. She appeared more subdued and withdrawn but also indicated that she was fine at home. She exhibited good concentration and focus. The source changed [Plaintiff]'s anti-anxiety medication to cover the emotional reactivity but otherwise [Plaintiff]'s mental status exam was largely normal. At a follow-up in February, she reported an increase in symptoms but due to a possible health issue (abnormality of the breast). She otherwise had a

stable mental status examination. In March, once the health issue resolved, she felt better overall. She complained of some sleep disruption but otherwise no significant issues or changes in [Plaintiff's] mental symptoms or functioning. [Plaintiff] appeared more euthymic during the exam and reported improved mood. She had a normal mental status exam at that time. She was assigned a GAF of 60, indicative of moderate symptoms and limitations, generally. These notes are not consistent with total disability just prior to the alleged onset date. Rather, [Plaintiff] returned for follow-up in April complaining of exacerbation in symptoms related to significant psycho-stressors, including illness in the family, her own illness, and termination from her job. The source strongly encouraged individual psychotherapy at that time. At a follow-up in May, she continued to be anxious and depressed. She appeared tremulous and intermittently tearful. She described one episode of auditory hallucinations where she could hear voices and at one point felt her phone vibrating when it was not; however, she did not exhibit signs of psychosis at the time of the examination. She continued to have increased stressors, which contributed to symptoms. The source assigned a GAF of 50; however, this appears to be based on [Plaintiff's] increase in symptoms at that time rather than indicative of [Plaintiff's] adaptive functioning on a day-to-day basis over a greater period of time. Prior to this, she consistently had GAF ratings indicative of moderate symptoms or limitations. [Plaintiff's] mental status examination was abnormal, consistent with increased depression, irritability, and anxiety; however, this appears to be an acute exacerbation related to significant stressors following a period of improvement and stability.

In October 2017, [Plaintiff] sought emergency room care related to depression, anxiety, and "schizophrenia" alleging depression and hallucinations. There is no evidence of schizophrenia as a medically determinable impairment. Moreover, [Plaintiff] did not appear notably depressed or anxious during at least one exam despite these allegations. The treatment notes document allegations of auditory hallucinations, which [Plaintiff] described as hearing a baby crying. She appeared agitated. She exhibited flat affect, tearfulness, without eye contact. She appeared to be rocking in the chair. However, she spoke in full sentences. Her breathing was easy and unlabored. She endorsed suicidal ideations without plan. She was guarded as to mental symptoms. It is notable that [Plaintiff] sought emergency room care just one month prior and showed no such signs. She had a rash, which resolved. She did not exhibit signs of psychosis at the consultative examination, which was completed just a few weeks prior. She did not allege hearing a baby crying or other hallucinatory or delusional activity. Furthermore, just weeks before the emergency room visit, [Plaintiff] indicated that she was going to drive to Southern Ohio to be with her son following a break-up and miscarriage. She also cared for her neighbor's four-month-old daughter, who was present at the appointment, and [Plaintiff] was the primary caregiver. The source observed that the baby appeared healthy and well-nourished. [Plaintiff] was appropriate with interactions. [Plaintiff] also had just filed for disability, the current claim, yet did not allege hallucinations or psychosis during this appointment. Furthermore, while [Plaintiff] alleged

4

symptoms, such as amotivation, irritability, and reactivity, she was also not compliant with recommendations for psychotherapy, as she appeared "somewhat ambivalent" about this. She also denied thoughts of harm, either to herself or others. Her mental status exam was largely within normal limits, wholly inconsistent with the subsequent emergency room exam. [Plaintiff] subsequently called the treatment provider alleging "hearing and seeing things", which brought [Plaintiff] to the emergency room. [Plaintiff] would not commit to psychotherapy, however. This appears to be an acute episode rather than indicative of a psychotic disorder. Indeed, one source noted that [Plaintiff's] reported hallucinations were "somewhat unusual" and gave multiple but inconsistent descriptions, including hearing a baby crying, seeing a little girl fall, and a dog barking. The source noted that the "specificity of these hallucinations is a little unusual for something like a thought disorder." Moreover, [Plaintiff] requested a change or increase in benzodiazepine medications at that time. At a follow-up after some medication changes, [Plaintiff] showed improved functioning. She was canning vegetables and staying busy at home. She described occasional hallucinations where she believed she heard someone talking or a door closing but was adamant about lack of suicidal or homicidal thoughts. She further showed fair to good concentration and focus. Her mental status examination was largely within normal limits with no evidence of psychosis. It appears that [Plaintiff's] condition improved and stabilized, with a GAF score of 60 in December. She further indicated during a follow-up that she continued to babysit the neighbors' child. She alleged some hallucinations but not command in nature. She enjoyed spending time with the young child. She reported largely good response to medications, which were adjusted to accommodate break through symptoms, such as anxiety. [Plaintiff] had only one crisis intervention during this period and required only a three-day stabilization in October.

[Plaintiff's] medications were adjusted related to symptoms, reporting mood lability and emotional reactivity. She alleged hallucinations, such as the cat or teddy bear calling her name. She then stated that she heard voices since she was a child, which is not consistent with other reports. She further was not compliant with recommendations for exercise but continued to care for the neighbors' child, which was enjoyable. In June 2018, [Plaintiff] reported side effects of medications, such as sleep disturbance and irritability. She reported ongoing hallucinations but again indicated these were not command in nature and further stated that she "does not feel they are particularly intrusive." She reported increased stress related to an upcoming mood but generally did not exhibit notable deficits on exam.

In September 2018, [Plaintiff] was evaluated for mental health treatment after her prior treatment provider left the practice. Following the assessment, sources noted schizoaffective disorder, bipolar type; however, it is significant that [Plaintiff's] description of hallucinations had changes, as she stated that voices told her to hurt herself or hearing a dog or neighbors that do not exist. However, she also reportedly knew that these things were not actually present. She further reported unemployment related to losing multiple jobs because of theft. She had not had a

suicide attempt during the relevant period and denied suicidal ideations. She reported a recent panic attack for which she sought emergency room care; however, she stated that she was typically able to "get [panic attacks] under control". She appeared depressed, anxious, with flat affect. She was mildly withdrawn and guarded. She was mildly tangential as well. However, she was cooperative. There is no indication that [Plaintiff] was responding to internal stimuli during the exam. She also reported a good relationship with family members. She also drove two hours to seek treatment, which generally shows better functioning than alleged. Sources changed [Plaintiff's] medications to address [Plaintiff's] symptoms. Sources also strongly encouraged [Plaintiff] to cut back on Valium/Xanax use. Furthermore, at a follow-up in October, [Plaintiff] reported caring for her husband postoperatively. She cared for a four-acre farm. She reported mood lability; however, she indicated that while symptoms were increased, she understood they would pass, stating "this too shall pass". She heard a dog barking in her basement but otherwise did not report or exhibit signs of psychosis. Her mental status exam showed some deficits, such as depression, blunted affect, and preoccupied thoughts but otherwise fairly benign findings. She also reported improvement with medication changes and indicated that she was now watching her 18-month-old "granddaughter" for the last six days. She endorsed similar symptoms and functioning at a follow-up in January 2019 with no significant changes noted; however, her mental status exam was largely normal. In May 2019, [Plaintiff] alleged various symptoms, including beating her husband in her sleep, and nightmares. She reported various stressors related to family. Significantly, [Plaintiff] was helping her mother bake and decorate cakes for the mother's bakery business. [Plaintiff] was also cooking and cleaning for her mother and taking her mother to appointments. [Plaintiff] confirmed this at the hearing. She further told sources that she was scheduled for a vacation later that month. She also reported feeling happier when with family and caring for grandchildren. While not dispositive of disability, these activities certainly support greater abilities and functioning than [Plaintiff] has alleged, generally.

[Plaintiff] transferred care to Hopewell with an initial evaluation in July 2019. Her mental status at that time was normal. She began psychotherapy. She was making some progress. One source noted that [Plaintiff] had "long term issues" with Xanax when [Plaintiff] requested an additional pill per day. [Plaintiff] did not look at the provider and noted some issues with hallucinations and paranoia; however, she also showed fair insight and judgment as well as fair impulse control. She was depressed with no eye contact but otherwise a normal presentation. [Plaintiff] subsequently had an acute period of increased symptoms related to the care of her "granddaughter" but nonetheless was making progress in therapy.

In September 2017, [Plaintiff] underwent a consultative psychological examination performed by Dr. Ward. [Plaintiff] indicated she had never been formally psychiatrically hospitalized. She reported a past suicide attempt but did not require hospitalization. She notably told Dr. Ward she had been fired form jobs due to theft.

6

> Indeed, she was terminated from Sears due to theft, which precipitated an exacerbation in symptoms and the current claim of disability. She reported difficulty with concentration and pace in work environments and also descried difficulties getting along with coworkers, supervisors, and the public. This is not consistent with statements to treatment providers, as noted above, because [Plaintiff] previously stated she generally got along well with coworkers. She had some increase in irritability at work but no significant episodes of anger or outbursts. She reported symptoms primarily when she left the house but did well at home. She could manage daily activities. She appeared cooperative but anxious and withdrawn. She had normal speech, however, with no loose associations or flight of ideas. She was anxious, emotionally overwhelmed, and tearful or irritable at points of the interview. However, she was able to complete the evaluation process adequately. She exhibited normal intelligence but with some difficulty related to distractibility and concentration/focus. She exhibited sufficient judgment. Dr. Ward diagnosed PTSD and bipolar disorder. Dr. Ward opined [Plaintiff] would have some difficulty maintaining attention and focus as well as consistent attention to work tasks. She would have difficulty responding appropriately to others, particularly critical feedback. She would likewise have difficulty responding appropriately to work stress in a competitive work setting. The undersigned finds the examination and assessment unpersuasive, as it appears to rely heavily on [Plaintiff's] subjective report of symptoms and limitations, particularly as it relates to past work environments. However, [Plaintiff] lost her job not due to emotional deterioration but due to theft. Prior to this, she reported increased stress and difficulty coping with stress or relating with others at work but was nonetheless capable of performing work, generally. She had improvement and stability with appropriate treatment for more than one year while working and without decompensation. Dr. Ward's assessment is also unpersuasive because it does not provide specific function-by-function abilities or limitations in light of [Plaintiff's] mental impairments. [Plaintiff's] limitations on examination as well as the subjective report of symptoms supports some limitation in functioning, as noted above; however, it does not warrant the degree of limitation suggested by Dr. Ward's assessment. Rather, the undersigned considered the examination and assessment in conjunction with the other evidence and finds that the above residual functional capacity adequately accommodates [Plaintiff's] mental impairments. Each limitation addresses [Plaintiff's] primary symptoms, including difficulty with concentration and pace, complexity of tasks, and stress tolerance.

(R. at 18-22 (internal citations and footnote omitted).)

## IV. ADMINISTRATIVE DECISION

On October 15, 2019, the ALJ issued his decision. (R. at 9-30.) First, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 31,

7

2022.  (R. at 14.)  Then, at step one of the sequential evaluation process,[1] the ALJ found that Plaintiff has not engaged in substantially gainful activity since March 31, 2017, the alleged onset date.  (*Id.*)  The ALJ found that Plaintiff had the severe impairments of depressive disorder; anxiety disorder; posttraumatic stress disorder (PTSD); bipolar disorder/schizoaffective disorder, bipolar type; and personality disorder.  (*Id.*)  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 15.)

Before proceeding to Step Four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] is able to understand, remember, and carry out simple repetitive tasks. She is able to respond appropriately to supervisors and coworkers in a task-oriented setting with only occasional public contact and occasional interaction with coworkers. She is able to

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> adapt to simple changes and avoid hazards in a setting without strict production quotas.

(R. at 17.) At step four of the sequential process, the ALJ determined that Plaintiff is capable of performing her past relevant work as a general laborer, which does not require the performance of work-related activities precluded by Plaintiff's RFC. (R. at 23.) Relying on the VE's testimony, the ALJ made an alternative that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 24-25.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since March 31, 2017, the alleged onset date. (R. at 25.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In her Statement of Errors, Plaintiff puts forth two assignment of error: that the ALJ failed to comply with 20 C.F.R. § 404.1520c during his evaluation of the State agency psychologists' opinions, and that the ALJ failed to properly account for all of the credible limitations opined by the State agency psychologists. (ECF No. 17 at PAGEID ## 758-767.) First, Plaintiff argues that in his discussion of the State agency psychologists' opinions, "the ALJ failed to cite actual evidence . . . to support his conclusion," that "[t]he ALJ did not properly evaluate the opinions of [the State agency psychologists] for supportability," and that the ALJ also failed to discuss the consistency of the State agency psychologists' opinions. (*Id.* at PAGEID ## 758-764.) Plaintiff further argues that because the ALJ found the State agency psychologists' opinions to be persuasive overall, the ALJ erred by only explaining why some of the State agency psychologists' opinions were omitted from the RFC. (*Id.* at PAGEID ## 765-767.) Plaintiff argues that "[a] subsequent reviewer would certainly have no reason to believe that the rest of the state agency psychologists' opinions were not credible, and therefore should be incorporated into the [RFC]," and concludes that "[t]he ALJ's decision to find those opinions

credible, and then remain completely silent when he created [an RFC] that did not account for those opinions constitutes reversible error." (*Id.*)

In response, the Commissioner argues that the ALJ's evaluation of the State agency psychologists' opinions "was consistent with the regulations and supported by substantial evidence." (ECF No. 22 at PAGEID ## 780-790.)  Specifically, the Commissioner argues that the ALJ properly analyzed and discussed the supportability of the State agency psychologists' opinions by undermining the opinion of consultative examiner Dr. Ward, which served as the basis for the State agency psychologists' opinions. (*Id.* at PAGEID ## 780-783.)  The Commissioner further argues that the ALJ properly discussed the consistency of the State agency psychologists' opinions by "cit[ing] many specific examples of the evidence that was inconsistent with [the State agency psychologists'] more restrictive limitations. (*Id.* at PAGEID ## 783-787.)  As for Plaintiff's second assignment of error, the Commissioner argues that "the ALJ was not required to adopt every single limitation in the [State agency psychologists'] opinions that he did not specifically discount," and that "contrary to Plaintiff's arguments, the ALJ did explain how [the State agency psychologists'] limitations were accounted for." (*Id.* at PAGEID ## 787-790.)  The Commissioner further argues that "there is no inconsistency in finding that part of an opinion is generally consistent with the evidence in the record while not adopting each limitation in that opinion verbatim." (*Id.* at PAGEID # 789.)  Plaintiff did not file a Reply brief, so the matter is ripe for judicial review.

As discussed below, the Undersigned finds Plaintiff's first assignment of error to be well-taken, at least as to the ALJ's discussion of the "supportability" of the State agency psychologists' opinions.  This finding obviates the need for in-depth analysis of the remaining issues, including whether the ALJ adequately discussed the "consistency" of the State agency

11

psychologists' opinion, and whether the ALJ failed to properly account for all of the credible limitations opined by the State agency psychologists. Thus, the Undersigned need not, and does not, resolve the alternative basis that Plaintiff asserts supports reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's other arguments if appropriate.

As a preliminary matter, a claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must assess a claimant's RFC based on all of the relevant evidence in a claimant's case file. *Id*. The governing regulations[2] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). Objective medical evidence is defined as "medical signs, laboratory findings, or both." 20 C.F.R. §§ 404.1513(a)(1); 416.913(a)(1). "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. §§ 404.1513(a)(3); 416.913(a)(3). "Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim." 20 C.F.R. §§ 404.1513(a)(4); 416.913(a)(4). "Medical opinion" and "prior administrative medical finding" are defined as follows:

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . .

---

[2] Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c.

>(A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
>(B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
>(C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
>(D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes . . . .
>
>* * *
>
>(5) Prior administrative medical finding. A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as:
>
>>(i) The existence and severity of your impairment(s);
>>
>>(ii) The existence and severity of your symptoms;
>>
>>(iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; . . . .
>>
>>(v) . . . your residual functional capacity;
>>
>>(vi) Whether your impairment(s) meets the duration requirement; and
>>
>>(vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

The governing regulations include a section entitled "[h]ow we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017." 20 C.F.R. §§ 404.1520c; 416.920c (2017). These regulations provide that an ALJ "will

13

not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, they provide that an ALJ will consider medical source opinions and prior administrative findings using five factors: supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

The regulations explicitly indicate that the "most important factors" to consider are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). Indeed, the regulations require an ALJ to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in a benefits determination or decision and allows that the ALJ "may, but [is] not required to, explain how [they] considered" the other factors. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). If, however, two or more medical opinions or prior administrative medical findings are equal in supportability and consistency "but are not exactly the same," an ALJ must also articulate the other most persuasive factors. 20 C.F.R. §§ 404.1520c(b)(3); 416.920c(b)(3). In addition, when medical sources provide multiple opinions or multiple prior administrative findings, an ALJ is not required to articulate how he evaluated each opinion or finding individually but must instead articulate how he considered the opinions or findings from that source in a single analysis using the five factors described above. 20 C.F.R. §§ 404.1520c(b)(1); 416.920c(b)(1). Finally, the regulations explain that the SSA is not required to articulate how it considered evidence from non-medical sources. 20 C.F.R. §§ 404.1520c(d); 416.920c(d).

The applicable regulations provide the following guidance for how ALJs should evaluate the "supportability" and "consistency" of medical source opinions and prior administrative findings:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2). In practice, this means that the "supportability" factor "concerns an opinion's reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021) (citing SSR 96-2p, 1996 SSR LEXIS 9 (July 2, 1996) (explaining supportability and inconsistency); 20 C.F.R. § 404.1527(c)(3), (4) (differentiating "supportability" and "consistency"); 20 C.F.R. § 404.1520c(c)(1), (2) (further clarifying the difference between "supportability" and "consistency" for purposes of the post-March 27, 2017 regulations)).

Against that backdrop, the ALJ provided the analysis below of the State agency psychologists' opinions:

> As for medical opinion(s) and prior administrative medical finding(s), we will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources. We fully considered the medical opinions and prior administrative medical findings in your case as follows: **The undersigned finds the State agency psychological consultants' mental assessments persuasive to the extent that these support limitation in [Plaintiff's] mental functioning but do not support total disability as alleged. However, the undersigned does not adopt the specific limitations, as these overstate [Plaintiff's] limitations in light**

15

> **of the evidence. For example, occasional flexibility with breaks, supportive and constructive feedback form supervisors, additional support when processing change. These specific limits overstate [Plaintiff's] limitations, generally given [Plaintiff's] daily activities, mental status examinations, and inconsistencies in statements and self-reported symptoms. Rather, the noted limitations have been considered and incorporated to the extent consistent with the evidence into the residual functional capacity. These limitations adequately address and thus accommodate [Plaintiff's] symptoms.**

(R. at 23 (internal citations omitted; emphasis added).) While the ALJ arguably discussed the consistency of the State agency psychologists' opinions with some of the other evidence of record, the ALJ made no effort to discuss the supportability of the State agency psychologists' opinions. Indeed, a reader with no previous knowledge of Plaintiff's claim would only know that the State agency psychologists' opinions included the following limitations: "occasional flexibility with breaks, supportive and constructive feedback form supervisors, additional support when processing change." (R. at 23.) Such a reader would have no information regarding how the State agency psychologists reached such conclusions, as the ALJ did not discuss any of the "medical evidence or supporting explanations" supporting the State agency psychologists' opinions as required. 20 C.F.R. § 404.1520c(c)(1).

The Commissioner maintains that by undermining the opinion of consultative examiner Christopher C. Ward, Ph.D., "the ALJ's decision provides an adequate explanation of his evaluation of the supportability [of the State agency psychologists' opinions]." (ECF No. 22 at PAGEID # 781.) But this argument fails. First, the Undersigned rejects the inherent premise of the Commissioner's argument – that the State agency psychologists' opinions were somehow inextricably linked to Dr. Ward's opinion such that invalidating Dr. Ward's opinion would necessarily attack the supportability of the State agency psychologists' opinions. The Undersigned finds no support for this, as a review of the State agency psychologists' opinions

16

confirms that while each State agency psychologist found that Dr. Ward's opinions were "consistent with and supported by other [medical evidence of record]" and that Dr. Ward's limitations were "consistent [with] someone [with] similar conditions and level of severity as [Plaintiff]," neither commented on the weight or deference they afforded to Dr. Ward's opinion, or how Dr. Ward's opinion impacted their analysis (if at all). (R. at 60, 89.) What's more, the ALJ conspicuously failed to discuss how he believed Dr. Ward's opinion may have influenced the State agency psychologists, so it is unclear on what ground the Commissioner rests this theory. (*See* R. at 15-23.) In the subject briefing, the Commissioner merely argues that the State agency psychologists "***appear*** to have relied significantly on Dr. Ward's opinion," but the Commissioner unsurprisingly provides no citation in support. (ECF No. 22 at PAGEID # 782 (emphasis added).) The Court cannot take the Commissioner's reading of the State agency psychologist's opinions at face value, however, especially given the ALJ's silence on the issue.

The Commissioner's argument is further flawed because it appears that the Commissioner has conflated the "supportability" and "consistency" factors under 20 C.F.R. § 404.1520c. For the ALJ to have adequately discussed the supportability of the State agency psychologists' opinions, the ALJ needed to evaluate what the State agency psychologists said they based their opinions on – not simply how their opinions compared to the record evidence as a whole, which only goes to the consistency of the State agency psychologists' opinions. *See Reusel*, 2021 WL 1697919, at *7 n.6 (discussing that an adequate "supportability" discussion "evaluat[ed] what [the doctor] said he based his opinion on," while a "consistency" discussion "compared the opinion to the evidence as a whole"). The ALJ simply did not do so, as the ALJ ***only*** discussed the State agency psychologists' conclusions – not how the State agency psychologists reached them.

17

To be clear, the Undersigned does not find error with the ALJ's decision for imperfect diction, but rather because the ALJ failed to discuss the supportability of the State agency psychologists' opinions and failed to provide enough context for the Court to track their reasoning. *Reusel*, 2021 WL 1697919, at *7 n.6 ("[T]the law does not require ALJ's to use perfect diction, but only that ALJs provide enough context for the court to trace their reasoning.") (citing *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011)). To that end, it is well settled that failure to discuss the supportability of the State agency psychologists' opinions requires remand, because "without fuller explanation, this court cannot engage in meaningful review of the ALJ's decision." *Reed v. Comm'r of Soc. Sec.*, No. 3:20-CV-02611-CEH, 2021 WL 5908381, at *6 (N.D. Ohio Dec. 14, 2021) (quoting *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, at *8 (N.D. Ohio June 3, 2021)); *see also Jacob B. v. Comm'r of Soc. Sec.*, No. 1:20-CV-617, 2022 WL 130761, at *8 (S.D. Ohio Jan. 14, 2022) ("In the absence of a sufficient explanation of supportability and consistency with the record as a whole, the Court cannot conclude that the ALJ's consideration of Dr. Rush's opinion is supported by substantial evidence . . . . Accordingly, the ALJ's decision must be reversed and remanded for further proceedings to properly analyze Dr. Rush's medical opinions pursuant to 20 C.F.R. § 404.1520c.").

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that the ALJ's decision denying benefits was not supported by substantial evidence and was not made pursuant to proper legal standards. Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** under Sentence Four of § 405(g).

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   January 24, 2022                     /s/ *Elizabeth A. Preston Deavers*
                                                               Elizabeth A. Preston Deavers
                                                               United States Magistrate Judge